IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:13-CV-132-F

| | |
|---|---|
| ALFRED G. GAGE,<br><br>Plaintiff,<br><br>v.<br><br>GOLDEN CORRAL CORPORATION,<br><br>Defendant. | **ORDER** |

This matter is before the court on the Motion for Summary Judgment [DE-38] filed by Defendant Golden Corral Corporation. The matter has been fully briefed, and is ripe for ruling. For the reasons stated herein, the Motion for Summary Judgment [DE-38] is ALLOWED.

## I. BACKGROUND

Plaintiff, proceeding *pro se*, alleges he was employed as a general manager by Defendant Golden Corral Corporation from September 2004 until February 2012 at its Garner, North Carolina, restaurant. He alleges he was unlawfully discharged from his employment in retaliation for his reporting of sexual harassment of a coworker by another general manager, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the North Carolina Retaliatory Employment Discrimination Act ("REDA").

Plaintiff initiated this action by filing a complaint in the Superior Court of Wake County, North Carolina on January 29, 2013. Defendant removed the action to this court on February 25, 2013, pursuant to 28 U.S.C. § 1331 (invoking this court's federal question jurisdiction) and 28 U.S.C. § 1367 (invoking this court's supplemental jurisdiction). Defendant filed the instant motion

for summary judgment on October 31, 2013 [DE-38]. Plaintiff filed his response [DE-41] on November 20, 2013, and Defendant filed a reply [DE-45] on December 16, 2013.[1] Thereafter, the court allowed each side to file a single supplemental brief after a motion to compel was allowed in part on January 22, 2014 [DE-56]. Plaintiff filed his supplemental brief on March 3, 2014 [DE-60] and Defendant filed its reply on March 17, 2014 [DE-61].

## II. STANDARD OF REVIEW

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden initially of coming forward and demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When making the summary judgment determination, the facts and all reasonable inferences must be viewed in the light most favorable to the non-movant. *Liberty Lobby*, 477 U.S. at 255. Once the moving party has met its burden, the non-moving party then must come forward and demonstrate that such a fact issue does indeed exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish any one of the essential elements of the party's claim on which he will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322-23.

## III. FACTS

The following facts are accepted as true for the purposes of this motion. Defendant is a North Carolina corporation that operates buffet style family restaurants, including one that was located in

---

[1] Plaintiff also filed a "Response" to Defendant's Reply on December 27, 2013 [DE-46]. As the court explained in its January 31, 2014, Order [DE-57], the court is not considering the "Response" when ruling on the instant motion for summary judgment.

Garner, North Carolina ("the Garner restaurant"). Defendant hired Plaintiff as the general manager of the Garner restaurant in 2004.

During Plaintiff's employment at Defendant, he was directly supervised by two district managers. Prior to January 2012, his district manager was Chad Fields. Beginning in January 2012, Carol Vajanyi became Plaintiff's supervising district manager. Both Fields and Vajanyi reported directly to David Webb, the East Regional Vice President. Webb's responsibilities included monitoring and supervising the operations and financial performance of company-owned Golden Corral restaurants in the East Region. Defendant contends that Plaintiff was unable to profitably operate the Garner restaurant, and after 2006, sales declined at that location under Plaintiff's management. Specifically, Defendant contends that the losses for the years 2006-2011 were as follows: ($191,611) in 2006; ($126,172) in 2007; ($117,318) in 2008; ($196.788) in 2009; ($321,562) in 2010; and ($276,915) in 2011. Aff. of Webb [DE-39-2] ¶ 6.

## A. Plaintiff's report of suspected harassment

In April 2011, an associate manager, Yvonne DeJesus (formerly known as Yvonne Murphy) who worked at the Garner restaurant was temporarily assigned to work at the Golden Corral on Capital Boulevard in Raleigh. While DeJesus was working at the Capital Boulevard restaurant, she told Plaintiff that the general manager at that location, Ted Cottrell, "made a comment of what he would do with her if he took her home." Pl.'s Dep. [DE-39-7] pp. 95, 228. DeJesus also told Plaintiff that Cottrell, after seeing a long line at the Capital Boulevard restaurant, commented that he "wouldn't stand in that long a line if they were giving away free pussy" and asked DeJesus if she would stand in such a long line if "they were giving away free dick?" Id. pp. 94, 229. DeJesus also reported that Cottrell told another kitchen manager to "get the fuck out of my kitchen" on several occasions, and in response to a directive from a district manager to tuck in his shirt, Cottrell said he

3

"would tuck his fucking shirt in when he was good and ready." *Id.* pp. 94-95, 229. Plaintiff contends that DeJesus was distraught when she reported Cottrell's comments to him. *Id.* p. 97.

Plaintiff then called Scott Schaberg, Defendant's Director of Company Relations. One of Schaberg's primary responsibilities is respond to and investigate all complaints of discrimination and harassment made by Defendant's employees in all company-owned stores across the country. Aff. of Schaberg [DE-39-3] ¶ 15. Schaberg receives and investigates an average of 15 employee complaints and/or concerns each week. *Id.* ¶ 6. After receiving Plaintiff's report about Cottrell's alleged comments, Schaberg spoke to DeJesus who told him that another employee had told her about Cottrell's "free pussy" comment. *Id.* ¶ 8. DeJesus also told Schaberg that she did not hear Cottrell make the alleged remark and she was not offended by the comment. *Id.* Schaberg determined that there was insufficient evidence to warrant any corrective action against Cottrell and closed the investigation. *Id.* ¶ 9. Plaintiff contends that when DeJesus returned to the Garner store a few weeks later, and learned that Plaintiff had made the report, she expressed dismay, and said she told Schaberg that she wasn't offended because she didn't want to damage her relations with the company. Pl.'s Dep. [DE-39-7] pp. 100, 233.

Sometime in the fall of 2011, Plaintiff commented to Fields, his then-district manager, that if any other general manager had said what Cottrell had said, they would be fired. Pl.'s Dep [DE-39-7] pp. 239, 244. Fields contends that he was already aware of Plaintiff's previous complaint about Cottrell because DeJesus had told him that Plaintiff wanted her to "turn in" Cottrell to Schaberg. Decl. of Fields [DE-39-5] ¶ 3. Fields contends that Plaintiff made the comment after he was told that he would not have the opportunity to manage the pavilion-style Golden Corral restaurant that was to open in Garner. *Id.* ¶ 4.

On January 26, 2012, Plaintiff's new district manager, Vajanyi, issued him a written warning

4

for leaving the Garner restaurant unattended by a manager when he left to get chocolate ice cream for the restaurant. *See* Decl. of Vajanyi [DE-39-4] ¶ 7. In response, Plaintiff remarked to Vajanyi that he wondered if Cottrell got written up for what he said to DeJesus. Pl's Dep. [DE-39-7] p. 245. According to Plaintiff, the fact that Cottrell "was able to get away" with making those comments, "stuck in [Plaintiff's] craw a little bit." *Id.* p. 237. Plaintiff contends he also told Vajanyi that he wondered if Defendant was prejudiced against black people, because Cottrell, a white male, did not get in trouble for the things he said to DeJesus, a black female.

## B. Plaintiff's performance

As the court already has recounted, Defendant asserts that Plaintiff was not profitably managing the Garner restaurant. Defendant contends that Plaintiff was counseled about the need to increase sales and profits.

Plaintiff does not dispute Defendant's characterization of the Garner restaurant's financial performance under his management, but he proffers other evidence he contends shows that he was performing at a satisfactory level. For example, he notes that he received a letter dated February 7, 2012, from Lance Trenary, Chief Operating Officer for Defendant, congratulating Plaintiff on achieving a score of 90% or over on his latest CSQ, which made Plaintiff and his team "part of the elite 'Operations Excellence Club.'" *See* Pl.'s Ex. O2 [DE-42-9]. Defendant explains that CSQ stands for "cleanliness, service and quality, and the CSQ score measures those areas." 2d Aff. of Webb [DE-45-1] ¶ 2. "The CSQ score reflects food safety and quality, cleanliness, and service on the date of inspection" but "does not reflect profitability, proper use of personnel, or adherence to company policy." *Id.*

Plaintiff also notes that he received "Star Achiever" recognition in the second quarter of 2011. *See* Pl.'s Ex. N2 [DE-42-8]. The memorandum recognizing this accomplishment states: "Star

5

Achievers accomplish excellence through ensuring all of our metrics for success are achieved including our guest-focused CSQ measurements to guarantee our guests have the best experience when they choose to dine with us." *Id.* Defendant, however, notes that the Star Achiever award is based on three criteria, including "Financial, People, and Guest Results." 2d Aff. of Webb [DE-45-1] ¶ 3. Defendant asserts that Plaintiff's financial performance in the period he received Star Achiever recognition was still poor, although the scores in the other relevant areas were presumably high. *Id.*

As to Plaintiff's financial performance, Defendant asserts that general managers can increase the profitability of their restaurants by controlling food, labor and other operating costs. With regard to labor costs, Defendant asserts that it expects it managers to work substantial hours to help profitably run their restaurants. The Garner restaurant, like most Golden Corral restaurants, was staffed by three salaried managers; a general manager and two associate managers. According to Defendant, Golden Corral managers are expected to be scheduled to work at least 55 hours per week and to be on duty during all of the peak hours on Fridays, Saturdays and Sundays. In January 2012, Vajanyi discovered that Plaintiff was not following this standard, and instructed Plaintiff to change the hours for himself and the other managers. Plaintiff contends that he was unaware of this requirement. Plaintiff then produced a manager schedule to Vajanyi that increased his managers' hours for the next period, as opposed to the current period. Vajanyi then instructed Plaintiff to increase the managers' hours for the current period. Vajanyi reported this to Webb.

With regard to controlling food costs and increasing profitability, Defendant asserts it requires daily use of production sheets in every restaurant. According to Defendant, product sheets are used to determine the amount of food that a restaurant should prepare and have on hand for its guests each day, and they ensure that restaurant does not overproduce and thereby waste food and

drive up profit loss. Webb contends that he learned in February 2012 that Plaintiff was not properly completing production sheets. He states that he found Plaintiff's failure to properly complete production sheets to be very troubling and "an example of extremely poor judgment" given the Garner restaurant's poor performance. Aff. of Webb [DE-39-2] ¶ 15.

In terms of assessing a restaurant's profitability, Defendant contends that it closely monitors each restaurant's financial performance, which is measured on a period by period basis. Aff. of Webb [DE-39-2] ¶ 11. According to Webb, each period is roughly a month, is set out on the corporate calendar, and ends on a Wednesday. *Id.* Defendant asserts that "[o]ne of the most important signs of a restaurant's financial performance over a period is the restaurant's cost per guest ["CPG"] . . . which is derived from taking inventory." As explained by Webb:

> Managers are required to conduct inventory on Wednesday at the end of a period after preparation is completed. . . . CPG is the primary performance measurement derived from conducting inventory. CPG is determined by combining the value of the period's beginning inventory, the value of the period's inventory purchases, and value of the period's ending inventory. The result of the formula is the "usage" for the period, which is the dollar amount of food consumed by guests. The CPG is determined by dividing the actual guest count for the period into the usage figure. Restaurant managers input the inventory and purchase figures. The guest count during a period is calculated by and stored on Golden Corral's computer system and coincides with the end of period and timing of inventory. The guest count used in determining CPG is inserted automatically by the computer system and is not based on data inserted by a restaurant manager.

*Id.* ¶ 12. Defendant compares each restaurant's CPG against company food costs and other restaurants to determine a particular restaurant's overall profitability and profitability compared to other restaurants. *Id.* ¶ 11. CPG also factors into a general manager's bonus. Webb asserts that other managers in the past have found ways to artificially deflate the figure, so Defendant is vigilant to identify practices that result in inaccurate CPG calculations and reporting.

In February 2012, Vajanyi discovered that Plaintiff was conducting his inventory counts on

7

Tuesdays as opposed to Wednesdays, and she reported this to Webb. *Id.* ¶ 12; Decl. of Vajanyi [DE-39-4] ¶ 6. Plaintiff conducted the inventory on Tuesdays because he scheduled his assistant managers off on Wednesdays, and therefore would be shorthanded if he conducted inventory on that day. Pl.'s Dep. [DE-39-7] p. 211; Decl. of Vajanyi [DE-39-4] ¶ 6. He actually filled out the Inventory Verification form[2] required by Defendant, however, on Wednesday–using Tuesday's inventory data. Plaintiff asserts that this was acceptable, because he still completed the Inventory Verification form on Wednesday. Pl.'s Dep. [DE-39-7] p. 208 ("Again, this form needs to be filled out at the end of each period. It didn't say the inventory had to be done on this date. So if I did inventory–if we did inventory on Tuesday, we filled this out on Wednesday like we were supposed to."). He also asserts that his practice of conducting inventory on Tuesdays was acceptable because he still would have four weeks of inventory data. *See id.* ("You know, if a person–if a person does inventory on Tuesday, that means they did on Tuesday the prior period, okay. So either way you do it, you're going to have four Mondays, four Tuesdays, four Wednesdays, four Thursdays, four Fridays, four Saturdays."). Webb, however, viewed Plaintiff's practice as fraudulent. Aff. of Webb [DE-39-2] ¶ 12. According to Webb, when Plaintiff

> conducted his inventories on Tuesdays, he did not account for the guest count over roughly the next day and a half until the end of the period, yet the usage figure generated by [Plaintiff] would be divided, every period, by the guests who purchased

---

[2] The Inventory Verification form provided, in part, the following:

> The information on this document is required to be completed at the end of each period. The information should be accurate and completed as scheduled. The purpose of this form is to hold each Kitchen Manager and General Manager accountable for the inventory and inventory records. Failure to accurately report information is violation of the company code of ethics. Managers who knowingly misrepresent or record false or inaccurate data will receive disciplinary action up to and including termination.

Aff. of Webb [DE-39-2], Ex. A.

8

> food through the end of the period on Wednesday. This would always result in an inaccurate calculation of CPG and food cost percentage and led to distorted, incorrect financial reporting. . . . CPG is one of the figures regularly reported to [Defendant's] shareholders and board of directors. [Plaintiff's] violation of company policy for completing inventory cause such reporting of the Garner restaurant's CPG to be inaccurate.

*Id.*

### C. Plaintiff's termination

Defendant planned to open a pavilion-style Golden Corral restaurant in Garner, and to close the Garner restaurant managed by Plaintiff. Aff. of Webb [DE-39-2] ¶ 17. Webb contends that a pavilion concept restaurant is more challenging to run than a traditional restaurant, and due to Plaintiff's prior poor financial performance in the Garner restaurant, he was not selected to manage the new restaurant. *Id.* ¶ 18. Rather than terminate Plaintiff's employment, however, Webb decided in September 2011 to give Plaintiff the opportunity to manage a smaller, traditional restaurant in Henderson, North Carolina. *Id.* Webb states that prior to the pavilion restaurant opening, however, he learned of Plaintiff's conduct with regard to the scheduling of managers, production sheets, and inventory counts. Webb asserts that these issues, "combined with [Plaintiff's] long term decline in financial results at the Garner restaurant, caused me to change my mind about [Plaintiff's] future with the company." *Id.*

On February 22, 2012, Webb and Vajanyi met with Plaintiff at the Garner restaurant. Plaintiff was expecting to be told that he would be transferred to the Henderson restaurant, but instead, Webb informed him that his employment was terminated and provided him with a termination letter. The letter stated, in pertinent part:

> As General Manger of the restaurant, you are responsible for all aspects of the operation including financial success of the restaurant. Your leadership of the Garner restaurant has failed to make th restaurant successful. Your financial results since 2006 have steadily declined. Sales have continued to drop each year and profit

9

reached a low in 2010 with a loss of $321,562. 2011 results continued the sale decline trend and your restaurant loss was $276,915.

In addition to poor financial performance, you violated company directives regarding required timing of weekly inventories, production, and manager schedules. The lack of financial results and disregard for company directives has resulted in a decision to terminate your employment with Golden Corral effective, today, February 22, 2012.

Pl.'s Ex. P1 [DE-41-1]. Webb asserts that he was the sole decisionmaker for Plaintiff's termination, and had no knowledge of any report or statement that Plaintiff about Cottrell at the time he terminated Plaintiff. Aff. of Webb [DE-39-2] ¶ 19. Plaintiff, however, contends that his termination came about because of his report of Cottrell's alleged conduct to Schabert and his subsequent remarks about the same to Fields and Vajanyi.

## IV. DISCUSSION

Defendant argues it is entitled to summary judgment on Plaintiff's Title VII and North Carolina REDA claims.

### A. Retaliation in violation of Title VII

Title VII provides:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). Ordinarily, a plaintiff may establish a Title VII retaliation claim under the burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). First, a plaintiff bears the burden of establishing a prima facie case of retaliation, whereupon the burden shifts to the employer to establish a legitimate, non-retaliatory reason for the adverse action. If the employer sets forth a legitimate, non-retaliatory reason for the action, the plaintiff then

10

bears the burden of showing the employer's proffered reasons are pretextual or his claim will fail. *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004).

To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in a protected activity; (2) his employer took an adverse action against her; and (3) a causal connection exists between the protected activity and the asserted adverse action. *King v. Rumsfeld*, 328 F.3d 145, 151-52 (2003). In this case, the parties hotly dispute whether the first and third elements of the prima facie case have been met. Because the court agrees with Defendant that Plaintiff has failed to establish the third element–that a causal connection exists between Plaintiff's protected activity and his subsequent termination–Defendant is entitled to summary judgment.

The court agrees with Plaintiff that, at the very least, his April 2011 report to Schabert of Cottrell's alleged remarks to DeJesus constitutes protected opposition activity under Title VII.[3] *See Laughlin v. Metro. Wash. Airports Authority*, 149 F.3d 253, 259 (4th Cir. 1998) ("Protected activities [under Title VII] fall into two distinct categories: participation or opposition."). "Opposition activity includes internal complaints about alleged discriminatory activities." *Session v. Montgomery County Sch. Bd.*, 462 F. App'x 323, 325 (4th Cir. 2012) (unpublished) (per curiam) (citing *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405-06 (4th Cir. 2005)). Opposition activity is protected when an employee opposes an "actual unlawful employment practice" or "an

---

[3] The court does not agree, however, that the April 2011 report or any subsequent comments to district managers constitute protected *participation* activity. *See Laughlin*, 149 F.3d at 259 (explaining that under § 2000e-3(a), participation activities include making a charge, testifying, assisting or participating in an investigation, proceeding, or hearing under Title VII). Plaintiff's internal report and subsequent comments do not constitute the filing of a charge under Title VII, nor did they involve Plaintiff testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII. *See id.* at 258-59 (emphasizing that the participation clause only protects activity involved in an ongoing Title VII investigation). There was no ongoing Title VII investigation, proceeding or hearing in which Plaintiff could participate at the time he made his report and subsequent comments, and therefore his conduct is not protected by the participation clause.

11

employment practice that the employee *reasonably believes* is unlawful." *Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 338 (4th Cir. 2006). The issue of "whether an employee reasonably believes a practice is unlawful is an objective one" and "may be resolved as a matter of law." *Id.*

Here, it is true that the two vulgar comments Cottrell allegedly made to DeJesus may not constitute a hostile work environment as a matter of law, and therefore Plaintiff was not opposing an actual unlawful employment practice. *See id.* at 339 (explaining that a hostile work environment is a "workplace . . . permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" and that therefore the plaintiff's complaint about a co-worker's crude and racist remark towards a news report did not constitute an "actual hostile work environment"). The court nevertheless finds that Plaintiff has proffered evidence showing that he had a good faith belief, which was objectively reasonable in light of the facts, that he was making an internal complaint about sexually hostile work environment. The facts, taken in the light most favorable to Plaintiff, show that he believed Cottrell had made a comment to his subordinate, DeJesus, about what he would do to her sexually if given the opportunity. The Fourth Circuit has noted that a discrete incident may be severe enough to be actionable in and of itself, *see Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011), and the court finds Plaintiff's belief that DeJesus was being subjected to a hostile work environment to be reasonable.[4]

It is still Plaintiff's burden, however, to proffer evidence showing a causal connection between this report and his subsequent termination. To satisfy the causation element of a retaliation claim, a plaintiff must show that his employer took the adverse employment action "'*because* the

---

[4] The court reaches this conclusion as to Plaintiff's initial report to Schaberg. The court does not find Plaintiff's subsequent comments to his managers to be opposition activity.

12

plaintiff engaged in a protected activity.'" *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007) (quoting *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)). Thus, it is necessary for Plaintiff to show that the relevant decisionmaker–here, Webb–had knowledge of Plaintiff's protected activity. *Id.* ("The first thing [Plaintiff must be able to prove, therefore is [the decisionmaker's] knowledge that he engaged in a protected activity."); *Dowe*, 145 F.3d at 657 (explaining that "[s]ince, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of a prima facie case" and concluding that the plaintiff had failed to do so because the relevant decisionaker was unaware of the plaintiff's protected activity). Here, Plaintiff has failed to come forward with any evidence to support the knowledge requirement, and has failed to offer any evidence which rebuts Defendant's assertion, which is supported by declarations and sworn affidavits, that Webb had no knowledge of Plaintiff's April 2011 reports, or even his subsequent comments.

Defendants have filed the sworn affidavit of Webb, who averred that the decision to terminate Plaintiff's employment was "solely" his decision. Aff. of Webb [DE-39-2] ¶ 19. Webb also averred that "[t]he extremely poor financial performance of the Garner restaurant under [Plaintiff's] leadership was a factor in [his] decision to terminate his employment," and that his "decision to terminate [Plaintiff] was finally brought about when [he] learned of [Plaintiff's] failure to comply with company directives and expectations concerning conducting inventory, scheduling managers, and use of production sheets." *Id.* ¶ 19. Webb further averred that he had no knowledge, prior to terminating Plaintiff's employment, of (1) Plaintiff's report to Schaberg about Cottrell allegedly making sexually harassing comments to DeJesus; (2) Plaintiff's report to Schaberg about Cottrell's vulgar statements to other employees; (3) Plaintiff's comment to Fields that if anyone else

13

had made the same sexually harassing comments as Cottrell they would have been fired; or (4) Plaintiff's comments regarding his speculation as to whether Cottrell was written up for the comments or whether Defendant was prejudiced against black people. *Id.* ¶¶ 20-21. Defendants also have submitted the affidavit of Schaberg, who averred that he did not tell Webb, nor any other member of management, of Plaintiff's report about Cottrell's alleged statements. Aff. of Schaberg [DE-39-3] ¶ 10. Finally, Defendants have proffered the declarations of Vajanyi and Fields, who both stated under penalty of perjury that they did not tell Webb about any comments Plaintiff made about Cottrell's actions. *See* Decl. of Vajanyi [DE-39-4] ¶ 8; Decl. of Fields [DE-39-5] ¶¶ 5, 7.

Plaintiff disputes that Webb was the sole decisionmaker as to his termination, and also disputes that Webb had no knowledge of his previous reports and comments about Cottrell. *See* Pl.'s Dep. [DE-39-7] p. 242 ("I honestly believe it was a combination of Lance Trenary, Ted Fowler, and David Webb [who were responsible for the termination decision.] They all have offices right by Scott Schaberg, within feet of each other, and I know darn well they would have talked about it. And the lines of communication are open all the time. This is not something one person would have kept to themselves. I guarantee you Scott Schaberg, as soon as I got off the phone with him went right to Lance Trenary's office and told him everything that was happening."). Plaintiff, however, admitted in his deposition that he has no actual knowledge or evidence that Schaberg reported what Plaintiff told about Cottrell to any other management members. *Id.* pp. 242-43. He also admitted that he has no knowledge that either Fields of Vajanyi reported Plaintiffs' comments about Cottrell to Webb. *Id.* p. 240. He also admitted that he had no proof to support his belief that Webb was not the sole decision-maker as to the termination of his employment. *Id.* p. 255-56. Instead of proof, Plaintiff relies upon his assertions that Defendant "is a billion dollar company" and "[c]ommunication is a must for a huge company" and references the weekly meetings various

14

members of management have with each other. *Id.* pp. 265-66. He asserts that Schaberg told other upper-level managers of his report about Cottrell because "[i]n my mind . . . [t]hat's just how I think any corporation is. It's not like an HR person is going to keep it to himself and not tell anybody."*Id.* p. 256. Plaintiff's assertion that he "without a doubt" knows that Webb was not the sole decisionmaker is based upon these thoughts and opinions. *Id.* In other words, instead of proof and evidence, Plaintiff proffers his speculation and conjecture. This is insufficient to create a genuine issue of material fact as to his retaliation claim. *See Robinson v. PVA III, L.P.*, Civil Action No. 2:05cv370, 2006 WL 2091007, at *7 (E.D. Va. July 20, 2006) (allowing motion for summary judgment on plaintiff's retaliation claim where plaintiff relied "solely upon mere speculation and conjecture to support her belief that Defendants could have gained knowledge of Plaintiff's Prior Lawsuit when the decision to eliminate her position was made.").[5] Defendant's Motion for Summary Judgment is therefore ALLOWED as to this claim.[6]

## B. North Carolina REDA claim

For a variety of reasons, Defendant is also entitled to summary judgment on Plaintiff's claim under REDA. That statute prohibits discrimination and retaliation against an employee "because the employee in good faith does or threatens to . . . [f]ile a claim or complaint, initiate any inquiry, investigation, inspection, proceeding or other action, or testify or provide information to any person"

---

[5] For this reason, Plaintiff's reliance on the temporal proximity between his initial report and any subsequent comments and his eventual termination is irrelevant. *See Pittman v. Hunt Constr. Group*, 564 F. Supp. 2d 531, 536 (E.D.N.C. 2008) (rejecting the plaintiff's attempts to rely on temporal proximity to show causation where he could not show that the decisionmaker knew of his protected activity), *aff'd*, 308 F. App'x 672, 2009 WL 136889 (4th Cir. Jan. 21, 2009) (per curiam).

[6] The court, accordingly, does not reach Defendant's alternative argument that Plaintiff has failed to proffer sufficient evidence that Defendant's stated reason for his termination was pretextual.

15

under certain enumerated statutes. N.C. Gen. Stat. § 95-241.[7]

Plaintiff's claim fails because he cannot show that he engaged in protected activity under one of the enumerated statutes. As Defendant notes, Plaintiff admitted in his deposition that his REDA claim is identical to his Title VII retaliation claim, which is based on his report of alleged sexual harassment. *See* Pl.'s Dep. [DE-39-7] p. 45. Plaintiff's report about sexual harassment, however, falls outside the enumerated employment practices listed in REDA. *See Delon v. McLaurin Parking Co.*, 367 F. Supp. 2d 893, 902 (M.D.N.C. 2005) (allowing an employer's motion for summary judgment on the plaintiff's REDA claim where the complaint "was merely a complaint to a manager about a supervisor" and "not one of the enumerated list that is protected under REDA").

Furthermore, even if Plaintiff's report about Cottrell's alleged sexual harassment could support a REDA claim, any such claim would have to be dismissed for failure to exhaust administrative remedies. Prior to filing a lawsuit against an employer for a violation of REDA, a plaintiff must file a complaint with the North Carolina Department of Labor within 180 days of the alleged violation and receive a right to sue letter. *See* N.C. Gen. Stat. § 95-242; *see also Brackett v. SGL Carbon Corp.*, 158 N.C. App. 252, 257, 580 S.E.2d 757, 760 (2003) ("[W]e hold the 180-day time limit for filing a REDA claim with the NCDOL is mandatory."); *Satterwhite v. Wal-Mart Stores East, L.P.*, No. 5:11-CV-363-BO, 2012 WL 255347, at *3 (E.D.N.C. Jan. 26, 2012) (dismissing REDA claim where plaintiff failed to file a complaint with the North Carolina

---

[7] The enumerated statutes include: the North Carolina Workers' Compensation Act (Chapter 97 of the North Carolina General Statutes); North Carolina Wage and Hour Act (Article 2A of Chapter 95 of the North Carolina General Statutes); North Carolina Occupational Safety and Health Act (Article 16 of Chapter 95); North Carolina Mine Safety and Health Act (Article 2a of Chapter 74); N.C. Gen. Stat. § 95-28.1 (prohibiting discrimination against any person possession the Sickle Cell or Hemoglobin C trait); Article 16 of Chapter 127A (protecting National Guard re-employment rights); N.C. Gen. Stat. § 95-28.1A (prohibiting discrimination based on genetic testing); Article 52 of Chapter 143 (North Carolina Pesticide Law of 1971); Article 5F of Chapter 90 (North Carolina Drug Paraphernalia Act of 2009). *See* N.C. Gen. Stat. § 95-241(a)(1).

Department of Labor or receive a right-to-sue letter). Here, Plaintiff has not shown that he made the required complaint to the North Carolina Department of Labor or received the right-to-sue letter. *See* Pl.'s Dep. [DE-39-7] pp. 160-64.

Accordingly, Defendant's motion for summary judgment is ALLOWED as to Plaintiff's REDA claim.

## V. CONCLUSION

For the foregoing reasons, Defendant' Motion for Summary Judgment [DE-38] is ALLOWED. The Clerk of Court is DIRECTED to close this case.

SO ORDERED.

This the 10 day of April, 2014.

James C. Fox
Senior United States District Judge